



## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **BRENT BORCK,** | Case No: 2:25-cv-11711 |
| Plaintiff, | Honorable Jonathan J.C. Grey |
| | Mag. Judge Elizabeth A. Stafford |
| v. | |
| **AVIS BUDGET GROUP, INC. &** | |
| **AVIS BUDGET CAR RENTAL, LLC,** | |
| Defendants. | |

---

### PLAINTIFF'S  FIRST AMENDED COMPLAINT[1]

Plaintiff, *pro se*, Brent Borck, ("Plaintiff" or "Mr. Borck"), hereby files this

Complaint against Defendant Avis Budget Group, Inc. ("Avis") and Avis Budget

Car Rental, LLC ("Avis LLC"), (collectively "Defendants") pursuant to this

Court's January 6, 2-26 Order [ECF No. 18] and states as follows:

### PARTIES, JURISDICTION, AND VENUE

---

[1] **NOTICE OF LIMITED SCOPE ASSISTANCE** – This document was drafted or partially drafted with the assistance of a lawyer licensed to practice in the State of Michigan, pursuant to MRPC 1.2(b). This document was prepared with the assistance of the University of Detroit Mercy School of Law *Pro Se* Legal Assistance Clinic, Theodore Levin U.S. Courthouse, Room 1044, 231 W. Lafayette Blvd., Detroit, MI 48226, Tel: (313) 234-2690.

1. Plaintiff is an African American male who resides in the City of Westland, Wayne County, Michigan.

2. Defendant Avis Budget Group, Inc. is a Delaware corporation headquartered in Delaware, and is the parent company of Defendant Avis Budget Car Rental, LLC, a Michigan Limited Liability Company doing business in Michigan. Upon information and belief, one or both of Defendants employed Plaintiff at all times relevant to this action.

3. Plaintiff brings claims for sex discrimination and disability discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq., 42 U.S.C. § 1983, and the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12112 to 12117, as well as Michigan's Elliott-Larsen Civil Rights Act (ELCRA), MCL § 37.2101 et seq, and Persons With Disabilities Civil Rights Act (PWDCRA), § 37.1101 et seq.

4. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 because Plaintiff's claims arise under federal law – specifically Title VII, 42 U.S.C. §1983 and the ADA.

5. This Court has supplemental jurisdiction over Plaintiff's state-law claims under the ELCRA and PDCRA pursuant to 28 U.S.C. § 1367, as these claims arise from the same case and controversy.

6. Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the action occurred in this District and Defendants conduct business in and services customers who are residents of this District.

## FACTUAL ALLEGATIONS

7. Plaintiff realleges and reincorporates paragraphs 1 through 7 as if fully set forth herein.

8. Mr. Borck is an openly homosexual, African American male who served time in the Army Reserves and has since become disabled. His disabilities include bipolar disorder, PTSD, anxiety, and depression.

9. Defendants are involved in the business of car rental services.

10. On April 15, 2024, Mr. Borck began full-time employment for Defendants as an Operations Manager in Defendants' office, located at 295 Lucas Dr., Detroit, MI 48242.

11. During his employment Mr. Borck's coworkers and Defendant Avis LLC knew that Mr. Borck was a homosexual, and African American.

12. Mr. Borck consistently performed his job duties with Defendants in a satisfactory matter.

13. Mr. Borck was employed by Avis LLC until he was wrongfully terminated on June 13, 2024.

3

14. During his employment, Mr. Borck's direct supervisors were Ali Afshar ("Mr. Afshar") and Saif Ammari ("Mr. Ammari"). Mr. Afshar and Mr. Ammari reported to Laurant Compaore, the Assistant City Manager (the "Assistant Manager"), who in turn, reported to Amanda Campbell, the City Manager (the "Manager").

15. Mr. Borck verbally informed the Manager of his disabilities: bipolar disorder, PTSD, anxiety, and depression.

16. On or about April 15, 2024, Mr. Borck began training under Defendants' Head of Sales (the "Sales Head").

17. The Sales Head trains new employees and assumes a managerial role with employees, such as Mr. Borck, during their training period.

18. During the entirety of Mr. Borck's employment, Mr. Borck reported to and was supervised by the Sales Head.

19. Mr. Borck was required to report to Sales Head as per his job duties, including to request smoke breaks, among other things.

20. Shortly after the pair had been introduced and began training, the Sales Head began following Mr. Borck to his smoke breaks and initiating varying conversations during which the Sales Head would inquire as to Mr. Borck's personal life.

4

21. Mr. Borck felt that the Sales Head moved these conversations from professional to flirtatious. This prompted Mr. Borck to immediately tell the Sales Head that he had a boyfriend.

22. This information did not deter the Sales Head from pursuing Mr. Borck.

23. During one smoke break in particular, the Sales Head asked Mr. Borck if he was faithful. Mr. Borck responded affirmatively but quickly left the area to return to his work, offended by the Sales Head's unwelcomed inquiries.

24. Over the next few weeks, Mr. Borck intentionally avoided taking smoke breaks with the Sales Head.

25. The Sales Head seemed to notice that Mr. Borck had become avoidant; he inquired as to why Mr. Borck had failed to notify him of these smoke breaks.

26. On or about May 8 2024, the Sales Head approached Mr. Borck during one of his smoke breaks and again inquired as to Mr. Borck's personal life and hobbies.

27. In response, Mr. Borck discussed his preference to stay home and play video games, including WWE2k24, a wrestling game.

28. The Sales Head then suggested that he could come to Mr. Borck's residence so the pair could play WWE2k24 together, and Mr. Borck indicated that his boyfriend would not like that.

29. The Sales Head continued further, adding that the pair could "do more than the game" and "wrestle in person."

30. These unwelcome remarks made Mr. Borck extremely uncomfortable and prompted him to report the conversation to the Manager the following day.

31. In response to Mr. Borck's concerns, the Manager suggested that he was overreacting, as the Sales Head was "just being friendly," and walked away from Mr. Borck.

32. In May, Mr. Borck spoke with the Manager concerning his disability accommodations.

33. Specifically, Mr. Borck requested a copy of his work schedule at least one week in advance, in order to schedule/reschedule his Veterans Affair's treatments and doctor's appointments around work shifts.

34. Upon such request, the Manager suggested that Mr. Borck's potential conflicts were a personal problem, rather than Defendant's problem.

35. The Manager also noted that she did not feel any sympathy for Mr. Borck, as she had become "so tired" of veterans and their sob stories, and was "not responsible for telling Mr. Borck to sign up for service."

36. Accordingly, Mr. Borck indicated that he was simply trying to arrange his schedule in advance, in order to avoid inconveniencing anyone.

6

37. The Manager continued to degrade Mr. Borck, inquiring why he had even applied for the position, suggesting that Mr. Borck was a liability rather than an asset, and claiming that individuals with mental health issues were not reliable.

38. On or about May 14, 2024, the Sales Head joined another one of Mr. Borck's smoke breaks.

39. The Sales Head's questions immediately became personal. He asked Mr. Borck's shoe size, the types of underwear he preferred, and the current color of Mr. Borck's underwear.

40. Mr. Borck responded that such information was personal, and that the Sales Manger's questions made him feel uncomfortable.

41. Later that day, Mr. Borck raised his concerns to the Manager for a second time.

42. The Manager asked if Mr. Borck was sure about the incident, whether he was hallucinating, and whether he had taken his medication.

43. Mr. Borck was upset by the Manager's reaction and, despite his report, the advances made by the Sales Head did not stop.

44. Mr. Borck had one or two more smoke break interactions with the Sales Head before being terminated by Defendant.

45. At the end of May 2024, in an attempt to maintain a professional relationship with his supervisor, Mr. Borck asked the Sales Head what the quickest way to grow up the company ladder would be.

46. The Sales Head indicated that Defendant's promotions were not always determined by seniority.

47. The Sales Head said that he had a lot of influence in the company, and that if Mr. Borck wanted to receive a promotion, Mr. Borck should "be good to the Sales Head" and "give him what he wants." This was understood to be a sexual quid pro quo request.

48. The Sales Head also asked whether Mr. Borck was a top, bottom, or vers (referring to Mr. Borck's sexual preferences).

49. Later that same week, Mr. Borck presented to the managers' office in the Avis rental car building, where he encountered the Assistant District Manager, and Airport Managers Mr. Afshar and Mr. Ammari.

50. Upon his arrival, Mr. Borck noticed that Mr. Afshar, Mr. Ammari, and the Assistant District Manager were talking very inappropriately about women, specifically concerning the number of women that Mr. Afshar had interacted with romantically.

51. Once Mr. Afshar, Mr. Ammari, and the Assistant District Manager were aware of Mr. Borck's presence, the Assistant District Manager, in response to Mr.

8

Afshar's remarks, stated, "as long as it is women and not men." Mr. Afshar added, "hell no that is disgusting."

52. Mr. Afshar, Mr. Ammari, and the Assistant District Manager continued to voice their disapproval of homosexuality—noting that it is prohibited in their religions and mocking the stereotypical mannerisms of homosexual men.

53. When Mr. Borck left the room, one of Mr. Afshar, Mr. Ammari, and the Assistant District Manager shouted "faggot" and the room erupted with laughter.

54. In early June 2024, Mr. Borck was called into the Assistant District Manager's office, allegedly as a result of his "poor performance."

55. The two discussed Mr. Borck's performance, while a representative from Defendant's corporate or human resources office listened via telephone.

56. During the meeting, Mr. Borck was suspended from his position until further notice.

57. As Mr. Borck left the Assistant District Manager's office, the Assistant District Manager disconnected the telephone and told Mr. Borck that he should be ashamed of himself, that he is going to die from AIDS, and that he would be killed in the Assistant District Manager's home country.

58. Shortly thereafter, Mr. Borck received a letter dated June 13, 2024, which served as an official notice of termination.

9

59. Defendant's termination letter indicated that he was being terminated because Mr. Borck:

    a. Was "[o]bserved by Management dozing off during team meeting."

    b. "Reported to work late."

    c. Was "Counseled by management following reported harassment concern (i.e. Brent to add hourly employee on Instagram)."

    d. "Failed to report to scheduled shift."

    e. "Engaged in acrobatic moves/dances with a cigarette in your mouth in front of customers."

60. The allegations made by the letter were false and merely pretextual in nature.

61. Mr. Borck never dozed off during team meetings.

62. Mr. Borck never reported late for work.

63. Mr. Borck never failed to report for any scheduled shift.

64. Mr. Borck did not perform acrobatic flips in front of customers.

65. Additionally, while Mr. Borck did add another hourly employee, Ms. Thomas on Instagram, he did so because they were friends.

10

66. Mr. Borck was never informed of Defendant's alleged policy prohibiting employees from following one another on social media.

67. On or about May 13, 2024, the Manager told Mr. Borck to "be careful" following fellow employees on social media, because someone *could* say that such activity amounts to sexual harassment.

68. The Manager failed to inform Mr. Borck of any purported company policy during their interaction, and Mr. Borck was left to learn of such at the time of his termination.

69. Accordingly, Defendants, through their own practices and customs, maintains a workplace that tolerates discrimination and harassment based on Mr. Borck's sexual orientation with different terms for homosexual and non-homosexual men by allowing pervasive, inappropriate remarks and behavior to continue without any action; discrediting reports of such; and engaging in the same behavior at management levels.

## COUNT I

## HOSTILE WORK ENVIRONMENT IN VIOLATION OF TITLE VII

70. Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

71. Under Title VII of the Civil Rights Act of 1964, as amended, Avis was obligated to refrain from discriminating against and permitting harassment of Mr. Borck because of his sexual orientation.

72. As a homosexual man, Mr. Borck is a member of a protected class based on sexual orientation.

73. Mr. Borck was subjected to unwelcome harassment by the Defendants' employees, agents, and representatives because of his sexual orientation.

74. The Defendants created a hostile work environment in violation of Title VII by the following acts:

    a. Subjecting Mr. Borck to sexually discriminatory comments and conduct based on his sexual orientation;

    b. Creating a sexually hostile work environment;

    c. Discharging or otherwise discriminating against Mr. Borck with respect to his employment because of his sexual orientation.

75. This conduct was so severe or pervasive that a reasonable person in Mr. Borck's position would find Mr. Borck's work environment objectively and subjectively hostile.

76. This harassment affected the term, condition, and/or privilege of Mr. Borck's employment.

77. As a direct and proximate result of Defendant's conduct, Mr. Borck suffered lost wages, earning capacity, physical and emotional distress, humiliation, and embarrassment.

## COUNT II

## QUID PRO QUO IN VIOLATION OF TITLE VII

78. Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

79. Under Title VII of the Civil Rights Act of 1964, as amended, Defendants engaged in impermissible quid pro quo harassment of Mr. Borck.

80. Defendants, by and through its employees, agents, and representatives, violated Title VII by engaging in quid pro quo harassment whereby:

    a. The Sales Head, Mr. Borck's supervisor, requested that Mr. Borck engage in sexual acts to secure a promotion.

    b. Mr. Borck rejected the Sales Head's unwelcome demand;

    c. Subsequently, Mr. Borck was terminated soon after;

    d. Upon information and belief, the rejection of the sexual demands from the Sales Head was the motivation for the termination.

13

81. As a direct and proximate result of Defendants' conduct, Mr. Borck suffered lost wages, earning capacity, physical and emotional distress, humiliation, and embarrassment.

## COUNT III

## DISABILITY DISCRIMINATION/FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADA

82. Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

83. Mr. Borck is a person with a disability within the meaning of the ADA due to bipolar disorder, PTSD, anxiety, and depression.

84. Each of the above-mentioned disabilities substantially limit Mr. Borck's major life activities, including requiring him to undergo ongoing therapy and medical treatment through the Veterans Administration.

85. Nonetheless, Mr. Borck was able to perform the essential functions of his position as Operations Manager and did so at all times.

86. In May 2024, Mr. Borck informed Defendants through the Manager of his disabilities verbally and requested his schedule in advance, a reasonable accommodation, which was immediately denied.

87. Defendants neither engaged in any interactive process to determine a reasonable accommodation nor offered a reason why the reasonable and necessary accommodation could not be given.

88. In response to Mr. Borck's accommodation request, Defendants subjected Mr. Borck to tangible, adverse employment action - suspension in early June 2024 and termination on June 13, 2024.

89. Defendant's stated reason for termination—i.e., poor performance—was pretextual.

90. As a direct and proximate result of Defendant's conduct, Mr. Borck suffered lost wages, earning capacity, physical and emotional distress, humiliation, and embarrassment.

## COUNT IV

## SEXUAL HARASSMENT BASED ON SEXUAL ORIENTATION IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT

91. Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

92. Under the Elliott-Larson Civil Rights Act, Defendants was obligated to refrain from discriminating against and permitting harassment of Mr. Borck because of his sexual orientation

93. As a homosexual man, Mr. Borck is a member of a protected class based on sexual orientation.

94. Mr. Borck was subjected to unwelcome harassment by the Defendants' employees, agents, and representatives because of his sexual orientation.

95. The Defendants created a hostile work environment in violation of Title VII by the following acts:

    a. Subjecting Mr. Borck to sexually discriminatory comments and conduct based on his sexual orientation;

    b. Creating a sexually hostile work environment;

    c. Discharging or otherwise discriminating against Mr. Borck with respect to his employment because of his sexual orientation.

96. This conduct was so severe or pervasive that a reasonable person in Mr. Borck's position would find Mr. Borck's work environment objectively and subjectively hostile.

97. This harassment affected the term, condition, and/or privilege of Mr. Borck's employment.

98. As a direct and proximate result of Defendant's conduct, Mr. Borck suffered lost wages, earning capacity, physical and emotional distress, humiliation, and embarrassment.

## COUNT V

16

## DISABILITY DISCRIMINATION/FAILURE TO ACCOMMODATE IN VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT

99. Plaintiff realleges and reincorporates the preceding paragraphs as if fully set forth herein.

100. Mr. Borck is a person with a disability within the meaning of the PWDCRA due to bipolar disorder, PTSD, anxiety, and depression.

101. Each of the above-mentioned disabilities substantially limit Mr. Borck's major life activities, including requiring him to undergo ongoing therapy and medical treatment through the Veterans Administration.

102. Nonetheless, Mr. Borck was able to perform the essential functions of his position as Operations Manager and did so at all times.

103. During the course of his employment Mr. Borck was denied reasonable accommodations by the Defendants.

104. Defendant's conduct violated the Persons With Disabilities Civil Rights Act.

105. As a direct and proximate result of Defendant's conduct, Mr. Borck suffered lost wages, earning capacity, physical and emotional distress, humiliation, and embarrassment.

## RELIEF REQUESTED

Accordingly, Plaintiff requests the following relief:

17

a. An order awarding reinstatement or front pay in lieu of reinstatement;

b. An order awarding compensatory damages;

c. An order awarding attorney fees and costs; and

d. An order awarding such other relief the Court deems just and equitable.

WHEREFORE, Plaintiff requests that this Court enter judgment in his favor against Defendants and award him economic and non-economic damages sustained as a direct and proximate result of Defendant's conduct, punitive damages, all other equitable and injunctive relief deemed appropriate at the time of final judgment, together with costs and interest, attorney fees, and all such other legal and equitable relief as this Court deems just and proper.

Respectfully submitted,

Brent Borck
Plaintiff, *Pro Se*
7365 Woodview St Apt 2
Westland, MI 48185
(248) 819-3065

Date: February __18___, 2026

18

## NOTICE OF LIMITED SCOPE ASSISTANCE

This document was drafted or partially drafted with the assistance of a lawyer licensed to practice in the State of Michigan, pursuant to MRPC 1.2(b). This document was prepared with the assistance of the Detroit Mercy Law *Pro Se* Legal Assistance Clinic, Theodore Levin U.S. Courthouse, Room 1044, 231 W. Lafayette Blvd., Detroit, MI 48226, Tel: (313) 234-2690.